# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# ALBANY DIVISION

MARY FARMER, individually as the Surviving :
Spouse of BOBBY LEE FARMER (Deceased) :
and in her capacity as the Executrix of the :
ESTATE of BOBBY LEE FARMER :
(Deceased) :
    Plaintiff, :
     :
v. : CASE NO.: 1:16-CV-054 (LJA)
     :
AIR AND LIQUID SYSTEMS :
CORPORATION, *et al.*, :
     :
    Defendants. :
_____

## **ORDER**

Before the Court are:

(1) Defendant Fisher Controls Inc.'s Motion for Summary Judgment (Doc. 271);

(2) Defendant Honeywell International Inc.'s Motion for Summary Judgment (Doc. 278); and

(3) Defendant McWane Inc.'s Motion for Summary Judgment (Doc. 280).

For the reasons set forth below:

(1) Defendant Fisher Controls Inc.'s Motion for Summary Judgment (Doc. 271) is **GRANTED**;

(2) Defendant Honeywell International Inc.'s Motion for Summary Judgment (Doc. 278) is **GRANTED**; and

(3) Defendant McWane Inc.'s Motion for Summary Judgment (Doc. 280) is **DENIED**.

# BACKGROUND

Plaintiff, Mary Farmer, individually and as the surviving spouse of Bobby Lee Farmer, initiated this action in the Superior Court of Dougherty County, Georgia, on February 26, 2016. (Doc. 1 at 2.) On March 28, 2016, Defendants filed a Notice of Removal, invoking this Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332. (*Id.*) With leave, Plaintiff filed an Amended Complaint on December 22, 2016. (Doc. 135.) Therein, Plaintiff alleges, against twenty-five defendants, causes of action including: (1) Negligence; (2) Product Liability Negligence; (3) Loss of Consortium; (4) Punitive Damages; and (5) Wrongful Death. (*Id.*)

On May 22, 2017, Defendant Fisher Controls Inc. (Fisher) filed its Motion for Summary Judgment. (Doc. 271.) Plaintiff responded on July 25, 2017 (Doc. 331), and Fisher replied on August 1, 2017 (Doc. 333). On May 22, 2017, Defendant Honeywell International Inc. (Honeywell) filed its Motion for Summary Judgment. (Doc. 278.) Plaintiff responded on June 12, 2017 (Doc. 296), and Honeywell replied on June 26, 2017 (Doc. 327). On May 22, 2017, Defendant McWane Inc. (McWane) filed its Motion for Summary Judgment (Doc. 280). Plaintiff responded on June 12, 2017 (Doc. 301), and McWane replied on June 26, 2017 (Doc. 325). As such, the Motions for Summary Judgment are ripe for review. *See* M.D. Ga. L.R. 7.3.1(A).

# LEGAL STANDARD

### A. Summary Judgment

Federal Rule of Civil Procedure 56 allows a party to move for summary judgment when the party contends that no genuine issue of material fact remains and the party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Maddox v. Stephens*, 727 F.3d 1109, 1118 (11th Cir. 2013). "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Grimes v. Miami Dade Cty.*, 552 F. App'x 902, 904 (11th Cir. 2014).

"An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). "It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992). On a motion for summary judgment, the Court must view all evidence and factual inferences drawn therefrom in the light most favorable to the nonmoving party and determine whether that evidence could reasonably sustain a jury verdict in its favor. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Allen*, 121 F.3d at 646.

The movant bears the initial burden of showing, by reference to the record, that there is no genuine issue of material fact. *See Celotex*, 477 U.S. at 323; *Barreto v. Davie Marketplace, LLC*, 331 F. App'x 672, 673 (11th Cir. 2009). The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact or by demonstrating that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *See Celotex*, 477 U.S. at 322-24; *Barreto*, 331 F. App'x at 673. Local Rule 56 further requires that "documents and other record materials relied upon by [the moving party] be clearly identified for the court." M.D. Ga. L.R. 56. "Material facts not supported by specific citation to particular parts of materials in the record and statements in the form of issues or legal conclusions (rather than material facts) will not be considered by the court." *Id.*

"When that burden has been met, the burden shifts to the nonmovant . . . to go beyond the pleadings and to present competent evidence in the form of affidavits, answers to interrogatories, depositions, admissions and the like, designating specific facts showing a genuine issue for trial." *Lamar v. Wells Fargo Bank*, 597 F. App'x 555, 556-57 (11th Cir. 2014) (internal citations omitted). "All material facts contained in the movant's statement which are not specifically controverted by specific citation to particular parts of materials in the record shall be deemed to have been admitted, unless otherwise inappropriate." M.D. Ga. L.R. 56; *see also Mason v. George*, 24 F. Supp. 3d 1254, 1260 (M.D. Ga. 2014).

3

As the nonmovant facing a motion for summary judgment, Plaintiff was required to identify those material facts as to which she contends there exists a genuine dispute to be tried. The Local Rules require those responses to controvert statements of material facts in motions for summary judgment with "specific citation to particular parts of materials in the record." *See* M.D. Ga. L.R. 56. Accordingly, as to all statements asserted by Defendants in their Motions that are supported by specific record citation, the Court deems them to be admitted where the responding party has not responded with a specific citation to the record.

### B. Georgia Negligence Law as Applied to Asbestos Cases

The parties invoke this Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332. (Doc. 1.) "[E]xcept in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any diversity case is the law of the State." *Walker v. Armco Steel Corp.*, 446 U.S. 740, 745 (1980). "Under Georgia law, [w]hether proceeding under a strict liability or a negligence theory, 'proximate cause' is a necessary element of [a product liability] case." *Hoffman v. AC&S, Inc.*, 248 Ga. App. 608, 610–11 (2001) (quotations and citations omitted). "Thus . . . to survive summary judgment, an asbestos victim must present evidence that he or she was exposed to asbestos-containing products for which the defendant is responsible." *Thurmon v. Georgia Pac., LLC*, 650 F. App'x 752, 757 (11th Cir. 2016). "Such evidence may include [t]estimony of co-workers who can identify a plaintiff by name as having worked with or around a particular defendant's asbestos-containing products." *Hoffman*, 248 Ga. App. at 611. "Georgia law requires plaintiffs to prove exposure to a particular defendant's product in order to establish proximate cause because Georgia courts have refused to impose market-share or industry-wide liability upon asbestos manufacturers." *Thurmon*, 650 F. App'x at 757 (citing O.C.G.A. § 51-1-11(d)).

### FACTUAL BACKGROUND

Bobby Farmer was born on June 23, 1938, and died on June 18, 2016. (Doc. 350 ¶ 5.)[1] Plaintiff Mary Farmer, Mr. Farmer's wife, alleges that Mr. Farmer contracted pleural

---

[1] The relevant facts are derived from the parties' statements of material facts and responses thereto, and the record in this case. (Docs. 271-4, 278-2, 280-1, 296-1, 301-1, 331-1, 333-1, 350.) Where relevant, this factual summary also contains undisputed facts derived from the pleadings, the discovery and disclosure

mesothelioma as a result of asbestos exposure while working at the Albany, Georgia Coats & Clark plant (Coats). (Doc. 291-1 ¶ 3.) Mr. Farmer was not deposed prior to his death. (Doc. 350 ¶ 5.) Mr. Farmer, however, told his treating physicians that he was employed as a maintenance worker at a textile plant and that "he did a lot of boiler work in the past….in the 50s, 60s and 70s," and "he cut asbestos [insulation] off pipes in the past as part of his job." (*Id.*)

In an effort to identify the offending products, Plaintiff relies on Robert F. Pennington, a former co-worker of Mr. Farmer's at Coats. (*Id.* ¶ 6.) Pennington's deposition was taken on July 12, 2016. (*Id.*) No other fact witness testified on behalf of Plaintiff with respect to the identification of products alleged to have been the source of Mr. Farmer's asbestos exposure.[2] (*Id.*) Pennington worked with Mr. Farmer from 1969 to 1996. (*Id.* ¶ 7.) Pennington testified that, during the time Pennington began working at Coats in 1969, Farmer worked as a maintenance inspector and then as a preventative maintenance supervisor. (*Id.*) Pennington stated that as part of Mr. Farmer's responsibilities, Mr. Farmer supervised or assisted in performing maintenance work in the boiler room, dye house, and on the air conditioning units at Coats. (*Id.*) Pennington also testified that Mr. Farmer removed and cleaned up asbestos-containing thermal insulation used to insulate piping and equipment at the plant, and that, while doing so, Mr. Farmer breathed in dust from this insulation. (*Id.*)

Pennington testified that both he and Mr. Farmer were exposed to asbestos from their work removing and replacing asbestos-containing gaskets and packing associated with the pumps and valves in operation at Coats. (*Id.* ¶ 9.) Pennington explained that pump maintenance entailed removing the old gaskets and packing from the pump and replacing them with new gaskets and packing. (*Id.* ¶ 10.) This work was necessary to prevent the pumps from leaking. (*Id.*) He further stated that valve maintenance entailed removing the old

---

materials on file, and any affidavits, all of which are construed in the light most favorable to Plaintiff as the non-moving party. *See* Fed. R. Civ. P. 56; *Celotex*, 477 U.S. at 323.

[2] Plaintiff, Mary Farmer, was deposed on November 15, 2016, but could not offer any testimony identifying the equipment or products her husband worked with or around while he was employed at Coats. (*See* Doc. 257 at 47:16-48:1, 57:6-11.)

5

gaskets and packing from the valve and replacing with new gaskets and packing. (*Id.* ¶ 11.) This work was part of the valve rebuild process. (*Id.*)

## DISCUSSION

### I. Defendant Fisher's Motion for Summary Judgment (Doc. 271)

Fisher argues that it is entitled to summary judgment on Plaintiff's claims because Plaintiff has failed to establish causation. (Doc. 271-3.) Specifically, Fisher argues that "the record is devoid of any evidence that Mr. Farmer was ever exposed to asbestos from a product manufactured or supplied by Fisher. In the absence of exposure there can be no causation, and Plaintiff's claims fail in their entirety." (*Id.* at 4.) In response, Plaintiff argues that Mr. Farmer was exposed to asbestos while removing and replacing gaskets and packing on the Fisher valves. (Doc. 331 at 2.)

To show that there is a genuine issue of material fact as to causation, Plaintiff must point to evidence: (1) that Mr. Farmer was exposed to a specific asbestos-containing product manufactured or supplied by Fisher, *see Thurmon*, 650 F. App'x at 758 ("[T]he plaintiffs failed to demonstrate that Thurmon was exposed to any specific asbestos-containing gaskets manufactured or supplied by Crane Co. As such, Thurmon's injuries were not caused by any asbestos-containing gaskets manufactured or supplied by Crane Co."); or (2) under a negligent design theory, that Mr. Farmer was exposed to a Fisher product that required the use of an asbestos-containing component to function properly, *see id.* at 758–59 ("When there is no evidence that the defendant's originally designed product was defective [or] that an injury-causing post-sale modification was required for the defendant's original product to function, then summary judgment in favor of defendant is warranted[. Thus,] the plaintiffs had to offer some evidence that Thurmon's injuries were caused by a Crane Co. valve that required the use of asbestos-containing gaskets to function properly."). Pennington testified that Fisher was one of several manufacturers of valves installed at Coats and testified that Farmer was exposed to asbestos through assisting with work on the Fisher valves in three ways: (1) removing insulation (Doc. 233 at 127:13–15); (2) replacing gaskets (*Id.* at 129:12–16); and (3) removing old packing and installing new packing (*Id.* at 130:7–15). (Doc. 331-1 ¶ 7.) Furthermore, Pennington testified that Coats used the same type of replacement

6

gaskets and packing for all of the pumps and valves installed at the plant. (Doc. 331-1 ¶ 14.) Crucially, Pennington testified that the replacement gaskets and packing were manufactured by a third-party—not Fisher. (*Id.*) As Fisher did not supply the replacements, to survive Defendant's Motion, Plaintiff must show that Mr. Farmer was exposed to asbestos-containing insulation, gaskets, or packing originally supplied by Fisher. *See Thurmon*, 650 F. App'x at 758–59. Alternatively, Plaintiff must show that Fisher valves required asbestos-containing components to function properly. *Id.*

As to the insulation, Pennington testified that Fisher valves did not have external insulation when they arrived at the Coats plant. (*Id.* ¶ 15.) Moreover, Pennington admitted that he could not identify the manufacturer of the material used for insulation on the Fisher valves. (*Id.*) It is undisputed that Fisher has never manufactured, designed, sold, specified, recommended, distributed, or installed thermal insulation. (*Id.* ¶ 16.) There is also no evidence controverting Fisher's assertion that Fisher has never manufactured, sold, supplied, distributed, installed, or specified valves that were covered with insulation of any kind. (*Id.*) Therefore, Plaintiff has failed to show that the asbestos-containing insulation to which Mr. Farmer was exposed was manufactured or supplied by Fisher.

As to the gaskets, Pennington agreed he could not say that Mr. Farmer was the first person to replace the gaskets on any Fisher valves. (Doc. 331-1 ¶ 10.) Thus, Plaintiff has not established that Mr. Farmer was exposed to the original Fisher gaskets, and Pennington testified that the replacement gaskets were supplied by a third party. Accordingly, Plaintiff has failed to point to evidence showing that Mr. Farmer was exposed to asbestos-containing gaskets manufactured or supplied by Fisher. Moreover, Pennington admitted that he never observed Mr. Farmer disassemble a Fisher valve and that all of the gasket work Mr. Farmer performed took place at the flanges. (*Id.*) Fisher has never manufactured, designed, sold, specified, distributed, or installed flange gaskets. (*Id.* ¶ 17.) Furthermore, Fisher valves—as sold—never came equipped with flange gaskets.[3] (*Id.*)

---

[3] The evidence presented by Plaintiff does not create a genuine dispute as to this fact. Plaintiff argues that: (1) as a general practice, Fisher furnished instruction manuals with each of its valves; (2) the manuals provide its customers with guidance regarding the service, maintenance, and installation of the valve; and (3) the manuals instruct end-users to use standard asbestos gaskets at the flanges. (Doc. 331-1 ¶ 17.) To support her argument, Plaintiff cites to an excerpt of a deposition given by Fisher's corporate representative given in a

7

As to the packing, for the Fisher valves that were identified by Coats in response to non-party subpoenas and that were observed in the course of a site inspection during discovery, Fisher located and produced serial cards maintained by Fisher that documented the as-built construction specifications for each piece of equipment. (Doc. 331-1 ¶ 13.) Some of the equipment related to the serial cards did not contain packing. (Doc. 271-5 ¶ 5.) In all instances where these serial cards did set forth a construction specification for packing, however, those specifications called for asbestos-free Teflon packing. (Doc. 331-1 ¶ 13.) According to Fisher's Corporate Representative, this means that the Fisher valves known to be used at Coats would have contained non-asbestos Teflon packing at the time they were manufactured and sold to the customer.[4] (*Id.*)

---

different case. (*Id.* (citing Docs. 331-3, 331-4).) In the deposition, taken in 2008, Fisher's representative was asked whether he believed instruction manuals were sent to a manufacturer in that case. (Doc. 331-4 at 30:11–22.) The representative replied that he believed they were sent, because "it was common practice and still is to always ship an instruction manual with each valve for the components that were included in that shipment." (*Id.*) Plaintiff then points to an excerpt of a deposition given by Fisher's corporate representative given in yet another case. (Doc. 331-1 ¶ 17 (citing Doc. 331-3).) In this 2012 testimony, Fisher's representative is asked to review an excerpt of his deposition testimony in the "Shahabi" case—a third separate case to which Fisher was presumably a party. (*See* Doc. 331-3 at 29:2.) In this Shahabi deposition, which is recounted in the 2012 deposition to which Plaintiff cites, Fisher's representative was asked: "But one of the things that Fisher tells you in the instruction here in one of the gaskets, it tells you to use standard asbestos gaskets at the flanges; true?" Fisher's representative replied, "That was one of the options available to the customer." (*Id.* at 29:12–22.) Even if the Court were to consider the evidence proffered by Plaintiff—despite Defendant's numerous objections to the testimony, including that it is incomplete, arguably hearsay, and without context—none of this evidence, taken separately or together, disputes Fisher's statement that, as sold, Fisher valves did not come equipped with flange gaskets. That the instructions reference the use of standard asbestos gaskets at the flanges is not evidence that Fisher manufactured, designed, sold, specified, distributed, or installed such gaskets. Furthermore, the reliability and relevance of questions about manuals which have not been tied to this case is also not readily apparent. The fact that another party in a separate case received unidentified manuals is irrelevant, as is the assertion that a standard asbestos gasket at the flange was optional.

[4] The evidence presented by Plaintiff does not create a genuine dispute as to this fact. Plaintiff asserts that "Mr. Pennington testified 'hundreds' of Fisher valves were present at Coats & Clark during his career working with Farmer." (Doc. 331-1 ¶ 13.) As such, Plaintiff argues, "the small selection of Fisher valves, for which records do exist, do not represent the universe of Fisher valves at Coats & Clark during the 1969-1996 timeframe." Plaintiff's argument does not contradict Fisher's assertion that the valves known to have been used at Coats would not have contained asbestos packing. First, Plaintiff misrepresents Pennington's testimony. Pennington did not testify that there were hundreds of Fisher valves at Coats. Rather, Pennington testified that there were "hundreds and hundreds" of pumps and valves of all types in the dye house and other areas. (Doc. 235 at 119:24–120:1.) Specifically, when asked why he hadn't been able to "put a number on any of [the products in general]," Pennington stated, "One particular machine may have, you know, six different pumps and six different valves on it, or seven or eight you know . . . So I can't give you an exact number of any particular one. I can just say there's hundreds of all of them." (*Id.* at 119:15–120:6.) Second, outside of Pennington's speculative statement as to the number of pumps and valves at Coats, Plaintiff has

Moreover, there is no evidence that Fisher valves ever required any insulation, asbestos-containing flange gaskets,[5] or asbestos-containing packing to function properly.[6] (Doc. 331-1 ¶¶ 12, 15, 17.) Plaintiff has failed to point to evidence Mr. Farmer was exposed to any Fisher valve that required asbestos-containing components to function properly.[7] Nor has Plaintiff shown that Mr. Farmer was exposed to an asbestos-containing product manufactured or supplied by Fisher. As such, Plaintiff has not established that Fisher valves were the proximate cause of Mr. Farmer's injury. Accordingly, Plaintiff's negligence claims against Fisher fail. *See Hoffman*, 248 Ga. App. at 610–11 (quotations and citations omitted).

---

failed to put forth any evidence of specific Fisher valves at Coats besides those identified by Coats in its response to the non-party subpoenas. "Conclusory allegations and speculation are insufficient to create a genuine issue of material fact." *Valderrama v. Rousseau*, 780 F.3d 1108, 1112 (11th Cir. 2015).

[5] The evidence presented by Plaintiff does not create a genuine dispute as to this fact. Plaintiff cites to an excerpt from Fisher's representative's deposition in 2008, in which he was asked, "So by starring 22 and 23 here, Fisher is recommending that you buy spare asbestos gaskets for this valve?" (Doc. 331-1 ¶ 17 (citing Doc. 331-4 at 21:22–24).) Fisher's representative responded, "That's correct, with the exception of the word "asbestos" because this is listed as a gasket, asbestos. But as I mentioned before, the customers who want a non-asbestos gasket most often or more likely would order the non-asbestos variation of this as I mentioned." (*Id.* (citing 331-4 at 22:1–6).) Because, as Fisher's representative indicates, there are alternative options to asbestos gaskets, Fisher valves do not *require* asbestos gaskets to function properly.

[6] The evidence presented by Plaintiff does not create a genuine dispute as to this fact. Plaintiff cites to Fisher's representative's 2008 deposition testimony discussing Fisher's 1977 *Control Valve Handbook*. Fisher's representative acknowledges that the *Handbook*, a survey of valve technology in use at the time, discussed various types of packing, including some asbestos-containing packing. (Doc. 331-1 ¶ 12 (citing Doc. 331-4 at 12–16).) Even if the Court were to consider Plaintiff's proffered evidence despite Fisher's objections, the testimony cited, while indicating asbestos-containing components were an option, does not show that Fisher's valves required asbestos-containing components.

[7] In her response, Plaintiff attempts to establish that Fisher valves required asbestos-containing components to function properly. (Doc. 331 at 2.) As support for this contention, Plaintiff proffers Pennington's testimony regarding the Fisher Manual purportedly used by Pennington and Mr. Farmer when working with Fisher valves. Plaintiff stated that "[t]he manual told you initially, this is asbestos packing, so replace it with the asbestos packing, you know. So that's what we had in the parts room, that's what we used." (*Id.* (citing Doc. 235 at 92:23–93:1).) Defendant objects to this testimony as hearsay because Coats could not produce any such manual. However, even considering Pennington's testimony, a recommendation for use of asbestos-containing packing does not indicate that the valves would not function properly without it. Plaintiff's assertion, based on 2008 testimony from Fisher's representative discussing the 1965 edition of Fisher's *Control Valve Handbook*, that "Fisher cannot name a single application where asbestos gaskets would not be specified in 1965" fails for the same reason. (Doc. 331 at 4 (citing Doc. 331-3 at 36:24–37:2) (The representative was asked: "Could you name any [different applications where asbestos-containing gaskets might not have been specified in 1965] today?" He answered, "No. No, I couldn't. Again, it's very—very technical. Everything's got to be selected based on the customer's needs.").) This is not evidence that asbestos-containing packing was required. Furthermore, although Plaintiff cites Fisher's representative's 2008 testimony discussing the *Control Valve Handbook*'s instruction that "asbestos gaskets are necessary" in high-temperature control valves, even if such testimony is admissible as non-hearsay without production of the *Handbook* itself, Plaintiff has failed to present evidence that any Fisher high-temperature control valves were present at Coats. (Doc. 331 at 4 (citing Doc. 331-4 at 23:5–15).)

9

Because Fisher is entitled to summary judgment on Plaintiff's negligence claims, it is also entitled to judgment on Plaintiff's derivative claims.

## II. Defendant Honeywell's Motion for Summary Judgment (Doc. 271)

Honeywell asserts that it is entitled to summary judgment on Plaintiff's claims because Plaintiff has failed to establish causation. (Doc. 278-1.) Specifically, Honeywell argues that "Plaintiff has produced no evidence Honeywell manufactured, supplied, or otherwise placed into the stream of commerce an asbestos-containing substance that Mr. Farmer was exposed to." (*Id.* at 2.) In response, Plaintiff argues that she has presented "ample evidence that Mr. Famer was regularly exposed to asbestos through his work with asbestos-containing Honeywell valves and that such exposure contributed to the development of Mr. Farmer's mesothelioma." (Doc. 296 at 2.)

To establish a genuine issue of material fact as to causation, Plaintiff must point to evidence: (1) that Mr. Farmer was exposed to a specific asbestos-containing product manufactured or supplied by Honeywell, *see Thurmon*, 650 F. App'x at 758; or (2) under a negligent design theory, that Mr. Farmer was exposed to a Honeywell product that required the use of an asbestos-containing component to function properly, *see id.* at 758–59. Pennington identified Honeywell as one of several manufacturers of valves installed at Coats and testified that Farmer was exposed to asbestos through assisting with work on the Honeywell valves in five ways: (1) removing insulation (Doc. 233 at 110:14–22); (2) scraping off gaskets with a putty knife (*Id.* at 112:2–8); (3) removing old packing and cutting new packing (*Id.* at 113:14–17); (4) cleaning up old fibers, gasket materials, and insulation after maintenance (*Id.* at 114:22–115:1); and (5) inspecting Honeywell valves while insulation and gaskets were being removed (*Id.* at 115:22–116:7). Furthermore, Pennington testified that Coats used the same type of replacement gaskets and packing for all of the pumps and valves installed at the plant. (Doc. 296-1 ¶ 16; Doc. 233 at 141:9–14, 234:24–25, 235:1–7, 237:23–25.) Crucially, Pennington testified that the replacement gaskets and packing were manufactured by a third-party—not Honeywell.[8] As Honeywell did not supply the

---

[8] The evidence presented by Plaintiff does not create a genuine dispute as to this fact. Plaintiff cites the 2012 testimony of a Honeywell representative in a different case in which the representative indicated that it was Honeywell's practice to "supply" and "make available" replacement parts for its valves. (Doc. 296-1

10

replacements, to survive Honeywell's Motion, Plaintiff must show that Mr. Farmer was exposed to asbestos-containing insulation, gaskets, or packing originally supplied by Honeywell. *See Thurmon*, 650 F. App'x at 758–59. Alternatively, Plaintiff must show that the Honeywell valves to which Mr. Farmer was exposed required asbestos-containing components to function properly. *Id.*

Pennington testified that he was unaware of when the Honeywell valves were purchased or installed at Coats, and there is no evidence in the record that Mr. Farmer removed or replaced the original gaskets or packing on any Honeywell valve.[9] (Doc. 296-1 ¶¶ 7, 8.) Moreover, Honeywell did not manufacture, supply, design, recommend, or specify exterior insulation of any type for use on the industrial control valves manufactured by its Industrial Division. (*Id.* ¶ 20.) As such, Plaintiff has failed to demonstrate that Mr. Farmer was exposed to an asbestos-containing gasket, packing, or insulation originally manufactured or supplied by Honeywell.

Plaintiff attempts to establish that Mr. Farmer was exposed to Honeywell valves that required the use of asbestos-components to function properly by broadly asserting that "Honeywell specified the use of asbestos gaskets and asbestos packing in its valves." (Doc. 296 at 4.) In support, Plaintiff cites testimony of Honeywell's corporate representative in another case. (*Id.* (citing 296-3).) In that testimony, Honeywell's representative discusses product specifications for several types of Honeywell valves, which reference asbestos gaskets. (Doc. 296-3 at 39:13–40:25 (discussing specification for spiral wound gasket M-H

---

¶ 19.) Testimony from another case regarding Honeywell's general practices without any evidence that such practices were followed in this case is not sufficient to create a genuine issue as to a material fact.

[9] The evidence presented by Plaintiff does not create a genuine dispute as to this fact. Plaintiff responds to Defendant's assertion that "[t]here is no evidence of record that Bobby Farmer removed or replaced the original gasket or packing on any Honeywell valve" by stating that "Mr. Pennington was not asked by counsel for Defendant Honeywell whether Bobby Farmer removed or replaced the original gasket or packing on any Honeywell valve." (Doc. 296-1 ¶ 8.) Plaintiff misunderstands Honeywell's burden at the summary judgment stage. The movant can meet its burden by presenting evidence showing that there is no genuine dispute of material fact or by demonstrating that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *See Celotex*, 477 U.S. at 322-24; *Barreto*, 331 F. App'x at 673. To succeed in its negligence claim, it was Plaintiff's burden to "present evidence that [Mr. Farmer] was exposed to asbestos-containing products for which the defendant is responsible." *Thurmon*, 650 F. App'x at 757. Plaintiff did not present evidence of an element on which it bears the ultimate burden of proof—that Mr. Farmer was exposed to original Honeywell components. As such, it was Plaintiff's burden—not Honeywell's—to elicit such testimony, if possible, from Mr. Pennington.

368); *Id.* at 41:23–42:25 (discussing specification for spiral wound gasket); *Id.* at 48:1–49:17 (discussing various Honeywell valve series and noting that the specification indicates that "when no particular packing is specified, either shredded Teflon or Teflon Asbestos is supplied, depending upon the conditions and limitations in the following specifications"); *Id.* at 82:3–7 (discussing Teflon asbestos, graphite asbestos, and shredded Teflon packing options for the 1100 valve series); *Id.* at 97:1–98:18 (discussing specifications for the 9100 and 9200 valve series that specified flat gasket material).) To the extent that the testimony proffered by Plaintiff is admissible and to the extent that any of the testimony proffered actually establishes that a Honeywell valve required an asbestos-component to function properly—which is unclear—Plaintiff's claim still fails because Plaintiff has not established that any valve discussed in the proffered testimony was actually present at the Coats factory.[10] In fact, Plaintiff fails to make any attempt at all to point to evidence in the record that might establish the types of Honeywell valves present at Coats. Without evidence tying the accused valves to Coats, any assertion that Mr. Farmer was exposed to them is speculation. "Conclusory allegations and speculation are insufficient to create a genuine issue of material fact." *Valderrama*, 780 F.3d at 1112. Accordingly, Plaintiff has not established that Honeywell valves were the proximate cause of Mr. Farmer's injury, and her negligence claims against Honeywell fail. *See Hoffman*, 248 Ga. App. at 610–11 (quotations and citations omitted). Because Honeywell is entitled to summary judgment on Plaintiff's negligence claims, it is also entitled to judgment on Plaintiff's derivative claims.

### III. Defendant McWane's Motion for Summary Judgment (Doc. 280)

Plaintiff brings her claims against McWane as the successor-in-interest to Clow Corporation (Clow), which manufactured pumps under the trade name "Chicago Pump" from April 1, 1980 to October 31, 1985. (Doc. 301-1 ¶ 5.) McWane argues it is "entitled to summary judgment because there is no evidence that Mr. Farmer was exposed to asbestos from a Chicago Pump manufactured during the time period that McWane has liabilities for Chicago Pumps." (Doc. 280-3 at 3.) In response, Plaintiff asserts she "has presented ample

---

[10] The admissibility of this testimony is questionable given that the documents discussed in the testimony have not been entered into the record.

evidence that Mr. Farmer was regularly exposed to asbestos through his work with asbestos associated with Chicago Pumps for which McWane is responsible." (Doc. 301 at 2.)

In 1985, McWane purchased the stock of Clow and merged Clow into McWane through a series of transactions between 1985 and 1987. (Doc. 301-1 ¶ 6.) As a result, McWane is the successor-in-interest to Clow. (*Id.* ¶ 7.) On April 1, 1980, prior to McWane's purchase of Clow, Clow entered into an asset purchase agreement with FMC Corporation (FMC), whereby Clow purchased from FMC "assets of the pump and comminution product lines currently manufactured by FMC at its Itasca, Illinois plant and marketed under the trade name 'Chicago Pump.'" (*Id.* ¶ 8.) Through the agreement, Clow assumed liability for warranty service claims not to exceed $5,000.00 per incident under the terms of express warranties issued by FMC on products it sold. (*Id.* ¶ 9.) Clow assumed no other liabilities for products sold by FMC. (*Id.*) On October 31, 1985, Clow sold the Chicago Pump Company assets to Yeomans Chicago Corporation and ceased manufacturing any products under the trade name Chicago Pump as of that date. (*Id.* ¶ 10.)

The basis for McWane's Motion is that Plaintiff has failed to point to evidence that Mr. Farmer was exposed to asbestos from a Chicago Pump manufactured between 1980 and 1985. While the Court agrees that Plaintiff has failed to point to evidence in the record that Mr. Farmer was exposed to a Chicago Pump manufactured between 1980 and 1985, McWane is potentially liable as a successor under a post-sale failure to warn theory pursuant to § 13 of the Restatement (Third) of Torts.

Section 13 provides:

> (a) A successor corporation or other business entity that acquires assets of a predecessor corporation or other business entity, whether or not liable under the rule stated in § 12, is subject to liability for harm to persons or property caused by the successor's failure to warn of a risk created by a product sold or distributed by the predecessor if: (1) *the successor undertakes or agrees to provide services for maintenance or repair of the product* or enters into a similar relationship with the purchasers of the predecessor's products giving rise to actual or potential economic advantage to the successor, and (2) a reasonable person in the position of the successor would provide a warning.

13

(emphasis added). Plaintiff asserts that because McWane assumed liability for warranty service claims on some FMC products manufactured prior to the asset purchase in 1980, as a successor, McWane had a duty to warn about the danger of products manufactured by its predecessor. (Doc. 301 at 9.) In response, McWane relies on *Silver v. Bad Boy Enterprises, LLC*, 907 F. Supp. 2d 1351 (M.D. Ga. 2012), to assert that our sister court has considered and dismissed arguments identical to Plaintiff's. The facts of *Silver*, however, are distinguishable from those of the present case.

As to the *Silver* plaintiffs' argument that defendant was liable as a successor for failure to warn about the danger of a predecessor's product, the district court held:

> Plaintiffs contend that by taking over manufacturing operations for new Bad Boy Buggies vehicles in 2010, the Textron Defendants assumed a duty to warn previous customers regarding hazards in the pre-Purchase Agreement vehicles that the Textron Defendants did not manufacture or sell. Plaintiffs seek to impose this open-ended liability upon the Textron Defendants for vehicles they never manufactured, never sold, and never assumed liability for in their purchase of BBE's assets. Moreover, Plaintiffs have failed to cite any authority in support of this proposition, and the Court has located none. The Court declines to adopt such an unsupported, novel, and far-reaching theory of liability and concludes that it is unlikely the Georgia courts would do so.

*Id.* at 1358. In *Silver*, there is no indication that the Textron defendants had accepted any liability to provide *services for maintenance or repair* of the vehicles manufactured prior to the purchase agreement, and defendant BBE expressly retained liability for any litigation "arising out of or related to any [p]roducts manufactured, assembled, or sold on or prior" to the purchase agreement. *Id.* at 1354. Moreover, the court indicated that the *Silver* plaintiffs could not rely on the purchase agreement at issue in the case to support their claims against the defendants. *Id.* ("Textron was not even a party to the Purchase Agreement. Consequently, Plaintiffs cannot rely on the Purchase Agreement to support their claims against BB Buggies and Textron."). In contrast, McWane expressly assumed liability for warranty *service* claims of its predecessor's products. (Doc. 280-1 ¶ 9 (emphasis added).) Thus, the provisions of § 13 clearly apply here. Although McWane next argues that Georgia has not recognized § 13 as law, that assertion is also incorrect. In *DeLoach v. Rovema Corp.*, 241 Ga. App. 802 (2000), the Georgia Court of Appeals rejected the plaintiff's successor liability claim on the basis that

defendant's failure to warn could not have been the proximate cause of plaintiff's injury. The court noted, however, that "Section 13 does provide authority for imposing liability where the successor of a product seller undertakes or agrees to provide maintenance or repair services and fails to warn of a product-related risk." *Id.* at 804.

Because McWane agreed to provide warranty services under FMC warranties, McWane could be liable under § 13 if: (1) Mr. Farmer was exposed to asbestos-containing products supplied or manufactured by Chicago Pump or a Chicago Pump that required an asbestos-containing component to function, *see Thurmon*, 650 F. App'x at 758–59; (2) a reasonable person in the position of McWane would have provided a warning, *see DeLoach*, 241 Ga. App. at 804; and (3) McWane's failure to warn was the proximate cause of Mr. Farmer's injury, *see id.*[11] Because McWane moved for summary judgment on the basis that Plaintiff failed to show that Mr. Farmer was exposed to a Chicago Pump manufactured between 1980 and 1985, summary judgment is inappropriate due to McWane's potential successor liability under § 13 for Chicago Pump products present at Coats and manufactured prior to the asset purchase in 1980.

---

[11] McWane argues that, even if § 13 applies, Plaintiff's claim fails, asserting that, "Plaintiff's blanket statement . . . that McWane knew or should have known of the dangers of asbestos is unsubstantiated and irrelevant." (Doc. 325 at 5.) Without legal citation, McWane further argues, "[the issue is not whether McWane knew generally about asbestos hazards, but whether it knew about alleged asbestos hazards specifically associated with Chicago Pumps manufactured by FMC to which Mr. Farmer claims exposure. There is no evidence that McWane had knowledge of any alleged hazards." According to Georgia law, however, actual knowledge is not required. Rather, Plaintiff's burden is to show that McWane "knew *or should have known* of hazards associated with the asbestos contained in [Chicago Pumps components] when used in a foreseeable manner." *See John Crane, Inc. v. Wommack*, 277 Ga. App. 538, 540 (1997) (emphasis added). Plaintiff has proffered the declaration of Barry Castleman, Sc.D., who discusses the availability of numerous studies and articles disclosing the risk of asbestos as early as 1932 and notes that reference to cancer from asbestos appeared in the *New York Times*, *Business Week*, *Washington Post*, and *Scientific American* in 1948–49. (*See* Doc. 301-1 ¶¶ 25, 32 ("By 1932, there were 60 or more publications in print on asbestosis, and throughout the 1930s, many more articles were published regarding asbestos and the diseases it causes. Literature on asbestosis was substantially developed by 1935."); *see also id.* ¶¶ 17–29).) Thus, there is a genuine issue of material fact as to whether McWane knew or should have known of the asbestos hazards associated with Chicago Pumps. *See Wommack*, 227 Ga. App. at 540 ("From the foregoing evidence [that literature and studies regarding the hazards of asbestos were available as early as the 1930s,] the jury was authorized to find that . . . there was substantial information available to [defendant] which would have informed it of the hazards associated with asbestos exposure."); *see also Wells v. Ortho Pharm. Corp.*, 788 F.2d 741, 746 (11th Cir. 1986) ("Properly applying Georgia law, the district court found that prior to July 1980, when Mary Maihafer purchased [defendant's product], [defendant] had actual or constructive knowledge that [the product] might cause birth defects and thus was under a duty to warn purchasers . . . . Several studies existed prior to 1980 indicating that the use of spermicides might cause an increased risk of birth defects. The district court found, and we agree, that these studies were available to [defendant].").

15

## CONCLUSION

For the reasons set forth above:

(1) Defendant Fisher Controls Inc.'s Motion for Summary Judgment (Doc. 271) is **GRANTED**;

(2) Defendant Honeywell International Inc.'s Motion for Summary Judgment (Doc. 278) is **GRANTED**;

(3) Defendant McWane Inc.'s Motion for Summary Judgment (Doc. 280) is **DENIED**;

(4) Plaintiff's Motion for Hearing on Defendant Fisher Controls Inc.'s Motion for Summary Judgment (Doc. 332) is **DENIED**;

(5) Plaintiff's Motion for Hearing on Defendant Honeywell International Inc.'s Motion for Summary Judgment (Doc. 297) is **DENIED**; and

(6) Plaintiff's Motion for Hearing on Defendant McWane Inc.'s Motion for Summary Judgment (Doc. 302) is **DENIED**.

**SO ORDERED**, this 28th day of March, 2018.

                                                /s/ Leslie J. Abrams
                                        **LESLIE J. ABRAMS, JUDGE**
                                        **UNITED STATES DISTRICT COURT**